**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

      WILDEARTH GUARDIANS; POWDER RIVER BASIN RESOURCE COUNCIL; and SIERRA CLUB,

      Plaintiffs,

v.

      UNITED STATES FOREST SERVICE; TOM TIDWELL, in his official capacity as the Chief of the United States Forest Service; MARIBETH GUSTAFSON, in her official capacity as the Acting Regional Forester of the U.S. Forest Service; and GLENN CASAMASSA, in his official capacity as Acting Deputy Regional Forester of the U.S. Forest Service,

      Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND
PETITION FOR REVIEW OF AGENCY ACTION**

---

## INTRODUCTION

1.      Through this action, Plaintiffs challenge the United States Forest Service's consent to the issuance of a massive coal lease within the Thunder Basin National Grassland.

2.      The Thunder Basin National Grassland, which stretches across 572,000 acres in the Powder River Basin of northeastern Wyoming, is known for its biological diversity and scenic qualities.  High rolling plains, plateaus, steep rocky escarpments, and gentle plains characterize this landscape.  The Grassland – which contains some of the few remaining intact public grasslands in the Northern Great Plains – is home to a variety of wildlife species, including elk, black-tailed prairie dogs, and nesting mountain plovers.  Numerous raptor species, including the red-tailed hawk and ferruginous hawk, also reside in the Grassland.  And, as the Forest Service has recognized, "one of the largest concentrations of golden eagles in the nation is found in the Thunder Basin region."

3.      The Grassland harbors more than twenty rare plant communities, some of which are globally imperiled, and it provides crucial habitat for the greater sage-grouse, a candidate for listing under the Endangered Species Act.  All of these species and ecosystems contribute to the biological diversity for which the Grassland is known.

4.      The Grassland, which is administered by the U.S. Forest Service, is also important to the people of the Powder River Basin.  Open for public use year-round, the Grassland provides abundant recreational opportunities.  Hikers, campers, bikers, photographers, hunters, and anglers enjoy the beautiful landscape in an area otherwise greatly disturbed by surface coal mining.  Ranching is a significant economic enterprise on the Grassland.  And, as the Forest

Service has noted, the ecological benefits of its national grasslands are worth "many trillions of dollars."

5.        These ecological, recreational, and economic resources of the Grassland are threatened, however, by the Forest Service's consent to additional coal strip mining within the Grassland's boundaries.

6.        The Thunder Basin National Grassland is located in the Powder River Basin, which is the largest coal-producing region in the United States and contains some of the largest coal mines in the world.  Beyond the negative impacts to nearby ecosystems, the strip mines of the Powder River Basin have serious climate change implications.  The combustion of coal releases large quantities of $CO_2$, a heat-trapping gas that is fueling global climate change.

7.        As the largest source of coal in the country, coal mining in the Powder River Basin is linked to more U.S. greenhouse gas emissions than almost any other activity.  Indeed, in 2008 Wyoming Powder River Basin coal was responsible for approximately 13% of the country's $CO_2$ emissions.

8.        Spurred by the demands of mining operators, the United States Bureau of Land Management ("BLM") is now trying to expand these coal mining activities.  BLM is in the process of issuing new coal leases for six tracts of land near the town of Wright, Wyoming, called the "Wright Area lease tracts."   Collectively, the six Wright Area lease tracts contain nearly four billion tons of coal.

9.        Of the six Wright Area lease tracts, five are partially located within the Thunder Basin National Grassland.  Because the Grassland is part of the National Forest System, the Forest Service must consent to those coal leases before BLM can issue them.  In this case,

3

BLM's lease, and the Forest Service's consent decision, relate specifically to the South Porcupine tract, which includes 1,638 acres of National Grassland.

10.     As the manager of this National Grassland, the Forest Service is under no obligation to consent to coal leasing on its land.  The Forest Service not only has the authority to impose conditions on coal mining activities within the Grassland, it has the right to withhold its consent entirely.  *See* 30 U.S.C. § 201(a)(3)(A)(iii).

11.     Rather than exercising its authority to protect the Grassland's resources, the Forest Service instead abdicated its responsibility by consenting to the lease of the South Porcupine tract in July 2011.

12.     By opening the South Porcupine tract to coal strip mining, the Forest Service will further stress the Grassland's imperiled ecosystems.  Surface coal mining consumes large areas of land, completely destroying whatever existed on the land prior to mining.

13.     While the area is mined, it will cease to provide the many benefits of grassland ecosystems important to human life: watershed protection, clean air quality, erosion prevention, soil protection and generation, flood and drought mitigation, recreational opportunities, and other economic benefits tied to intact grasslands.  Instead, opening up this land to coal mining will make this tract and surrounding areas unusable for decades, release air and water pollution, harm wildlife and plants, irreversibly destroy habitats, and transform an intact portion of the Thunder Basin National Grassland into an industrial zone that cannot be used for recreational opportunities or other economic purposes.

14.     Though the Forest Service assumes that these mined areas will be effectively reclaimed, the agency's confidence is misplaced.  For although the Surface Mining Control and

Reclamation Act ("SMCRA") requires mined areas to be reclaimed "as contemporaneously as practicable," 30 U.S.C. § 1265(b)(16), BLM has consistently failed to ensure timely reclamation of the area's existing coal mines.  As a result, large swaths of land in the Thunder Basin remain consumed by active and dormant coal mines, rendering them unavailable for other uses such as livestock grazing, wildlife habitat, and recreation.

15.     In consenting to the South Porcupine lease, the Forest Service relied on BLM's Environmental Impact Statement for the Wright Area Coal Lease Applications (the "EIS" or "Wright Area EIS").  That EIS, however, suffers from serious deficiencies.  Among other things, the EIS fails to consider reasonable alternatives that Plaintiffs proposed, analyze mitigation measures for the project's effects on groundwater, and adequately analyze direct and indirect air quality impacts.

16.     By consenting to the South Porcupine coal lease, and by relying on a legally inadequate EIS, the Forest Service violated federal laws, including the National Environmental Policy Act ("NEPA"), National Forest Management Act ("NFMA"), SMCRA, and Administrative Procedure Act ("APA").

17.     Plaintiffs are a coalition of citizen groups who have joined the voices of other organizations and individuals in opposing this coal lease at every step of the process because BLM's lease of the South Porcupine tract, and the Forest Service's consent to that lease, is unlawful.

18.     Accordingly, Plaintiffs seek an order from this Court setting aside the Forest Service's South Porcupine consent decision until the Forest Service has complied with its obligations under federal law.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because the federal government is a defendant and this action arises under the laws of the United States.

20.     Venue is proper under 28 U.S.C. § 1391(e)(1) because several Defendants reside in this judicial district.  Venue is also appropriate pursuant to 28 U.S.C. § 1391(e)(2) because "a substantial part of the events or omissions giving rise to the claim," including the final agency action, took place in this judicial district.

## PARTIES

21.     Plaintiff WILDEARTH GUARDIANS is a non-profit organization based in Santa Fe, New Mexico, with offices in Denver and Phoenix, and is comprised of members from across the American West, including Wyoming.  WildEarth Guardians, and its members, are dedicated to ensuring the protection and restoration of the wildlife, wild places, and wild rivers that make up the American West.  WildEarth Guardians is also dedicated to safeguarding the Earth from the risks associated with climate change.

22.     WildEarth Guardians has members who actively and regularly utilize and enjoy the Thunder Basin National Grassland region for recreational, conservation, and educational reasons, in particular the lands that are slated to be strip mined as part of the South Porcupine coal lease.  These members hike, camp, view wildlife, enjoy the remoteness of the region, search for fossils, and draw inspiration from the landscape.  These members intend to return to the Thunder Basin National Grassland, and in particular the lands that are part of the South Porcupine coal lease, in 2012 and beyond in order to enjoy the area.  These members' enjoyment of the Thunder Basin National Grassland, and in particular the South Porcupine coal lease area,

will be diminished as a result of the Forest Service's decision to offer its consent to the coal lease.  A decision favorable to WildEarth Guardians would redress these harms.

23.     Plaintiff POWDER RIVER BASIN RESOURCE COUNCIL is a member-based conservation group located in the Powder River Basin region of Wyoming.  Formed in 1973 by ranchers and other concerned Wyoming citizens, the membership of the Powder River Basin Resource Council is today made up of approximately 1,000 concerned individuals, the majority of whom reside locally within the Powder River Basin.  The group has long been involved in working for responsible coal leasing and mining, addressing the impacts of strip mining on rural people and communities, and working for the preservation and enrichment of Wyoming's agricultural heritage and the responsible use of land, mineral, water, and air resources.

24.     The Powder River Basin Resource Council has a strong interest in ensuring the protection of the land, air, water, and mineral resources in the region.  The lease of the South Porcupine tract will directly affect many of the Council's members who depend on the Grassland for its recreational opportunities, and, for some, their livelihoods.  Furthermore, the Powder River Basin Resource Council is dedicated to preserving the quality of the land, mineral, water, and air resources in Wyoming in order to sustain the livelihood of present and future generations. The lease of the South Porcupine tract poses a severe threat to that goal.

25.     Plaintiff SIERRA CLUB is a national non-profit organization with approximately 1.3 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra

Club's concerns encompass climate change, air quality impacts, water quality, wildlife, and other environmental concerns. The Sierra Club's highest national priority campaign is its "Move Beyond Coal" Campaign, which aims to transition the nation away from coal and toward clean energy solutions. The Wyoming Chapter of the Sierra Club has approximately 800 members in the state of Wyoming, many of whom live, work, and/or recreate in the Powder River Basin.

26.     Defendant UNITED STATES FOREST SERVICE is a federal agency within the United States Department of Agriculture. The Forest Service is responsible for managing its lands nationwide, including the Thunder Basin National Grassland, in accordance with all applicable laws.

27.     Defendant TOM TIDWELL is sued in his official capacity as the Chief of the United States Forest Service. Mr. Tidwell is responsible for ensuring that Forest Service lands nationwide are managed in accordance with all applicable laws.

28.     Defendant MARIBETH GUSTAFSON is sued in her official capacity as Acting Regional Forester of Region Two of the United States Forest Service. Ms. Gustafson is responsible for ensuring that Forest Service lands within Region Two are managed in accordance with all applicable laws.

29.     Defendant GLENN CASAMASSA is sued in his official capacity as Acting Deputy Regional Forester for Region Two of the United States Forest Service. Mr. Casamassa is responsible for ensuring that Forest Service lands within Region Two are managed in accordance with all applicable laws. By denying Plaintiffs' administrative appeal of the South Porcupine consent decision, Mr. Casamassa issued the final agency action in this matter.

30. Plaintiffs' members who live, work, recreate, and conduct other activities in the areas adjacent to the South Porcupine lease are affected by poor air quality associated with existing coal leasing in the Powder River Basin, and have a substantial interest in ensuring they breathe the cleanest air possible. Plaintiffs and their respective members use and enjoy the Thunder Basin National Grassland and other areas adjacent to the South Porcupine lease for recreational, scientific, aesthetic, conservation and other public purposes, and are harmed by the local aesthetic and environmental impacts of coal mining there. Plaintiffs and their respective members also have a substantial interest in ensuring that the Forest Service complies with federal law, including the requirements of NEPA, SMCRA, and NFMA. Plaintiffs' and their respective members' interests have been, are being, and will continue to be irreparably harmed by the Forest Service's consent to BLM's decision to offer the South Porcupine lease in Campbell County, Wyoming.

## STATUTORY FRAMEWORK

### *Mineral Leasing Act*

31. The Mineral Leasing Act of 1920 authorizes and governs the leasing of public lands for mineral and gas development. *See* 30 U.S.C. §§ 181 *et seq.*

32. Under the Mineral Leasing Act, coal leases of Forest Service land "may be issued only upon consent of" the Forest Service and "upon such conditions as [the Forest Service] may prescribe with respect to the use and protection of the nonmineral interests in those lands." 30 U.S.C. § 201(a)(3)(A)(iii).

33.     The Act also mandates that "[e]ach coal lease shall contain provisions requiring compliance with the Federal Water Pollution Control Act and the Clean Air Act."  30 U.S.C. § 201(a)(34)(E).

### Surface Mining Control and Reclamation Act

34.     Congress enacted the Surface Mining Control and Reclamation Act ("SMCRA") in 1977 in recognition of the many detrimental effects of surface coal mining and the necessity of balancing energy goals against environmental degradation.  *See* 30 U.S.C. §§ 1201 *et seq.* SMCRA establishes standards for the operation of current coal mines as well as for the reclamation of previously mined lands.

35.     Because of the significant environmental effects of surface coal mines, SMCRA prohibits or restricts coal mining on certain federal lands recognized for their important ecosystems, natural beauty, cultural and recreational significance, and other values and resources.  *See generally* 30 U.S.C. § 1272(e).

36.     Among other protections, federal lands within the boundaries of a national forest are presumptively off limits to coal mining.  30 U.S.C. § 1272(e)(2).  Coal mining is only permitted on these lands if the Secretary of the Interior finds that they lack "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations."  *Id*.  Additionally, for national forest lands that are without significant forest cover and are located west of the 100th meridian (such as the Thunder Basin National Grassland), coal mining is prohibited unless the Secretary of Agriculture first determines that surface mining on those lands is in compliance with a variety of federal laws, including the

Multiple-Use Sustained-Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1975, and the National Forest Management Act of 1976. *Id.* § 1272(e)(2)(B).

37.     One of SMCRA's most important environmental mandates is that it requires contemporaneous reclamation of all land affected by surface coal mining. *See* 30 U.S.C. § 1265.

38.     The land affected by surface coal mines must be restored to a condition "capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses of which there is a reasonable likelihood." 30 U.S.C. § 1265(b)(2).

39.     The reclamation standards require the restoration of the affected lands to the "approximate original contour" of the land, the restoration or replacement of the topsoil, the minimization of hydrologic imbalance, the prevention of erosion, and the revegetation of the impacted lands. 30 U.S.C. § 1265(b)(1)-(21).

40.     Moreover, reclamation must proceed "in an environmentally sound manner and as contemporaneously as practicable with the surface coal mining operations." 30 U.S.C. § 1265(b)(16). This standard reflects Congress's goal for reclamation to be done thoroughly and in a manner as contemporaneously "as possible" with the surface coal mining operations. *Id.* § 1202(e); *see also* 30 C.F.R. § 816.100 ("Reclamation efforts . . . on all land that is disturbed by surface mining activities shall occur as contemporaneously as practicable with mining operations . . . .").

41.     Additionally, SMCRA prohibits surface coal mining on lands where contemporaneous reclamation is not feasible or possible. 30 U.S.C. § 1202(c).

### *National Environmental Policy Act*

42.     The National Environmental Policy Act ("NEPA") aims to promote government efforts "which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.

43.     Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4.  In the EIS, an agency must take a "hard look" at the environmental impacts of its proposed action.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

44.     The EIS process serves two central purposes:  First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  490 U.S. at 349.  Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Id.*

45.     The Council on Environmental Quality ("CEQ"), established under NEPA, is charged with overseeing the implementation of NEPA's environmental review process.  42 U.S.C. § 4344.  In order to discharge this function, CEQ has promulgated regulations that govern the EIS process.  *See generally* 40 C.F.R. §§ 1500 *et seq.*

46.     To pass muster under NEPA, an EIS must analyze "[t]he environmental effects of alternatives including the proposed action."  40 C.F.R. § 1502.16(d).  In the alternatives analysis, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," and, when eliminating an alternative from detailed analysis, the agency must briefly discuss the reasons it was eliminated.  *Id.* § 1502.14(a).

47.     The alternatives analysis "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This alternatives analysis is considered "the heart of the environmental impact statement." *Id.*

48.     NEPA requires agencies to analyze the direct, indirect, and cumulative impacts of each alternative. 40 C.F.R. § 1508.8; *id.* § 1508.7.

49.     Direct effects are defined as those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

50.     Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). These may include "effects on air and water and other natural systems, including ecosystems." *Id.*

51.     Cumulative effects are defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Cumulative effects may "result from individually minor but collectively significant actions taking place over a period of time." *Id.*

52.     An EIS must also include an analysis of the "[e]nergy requirements and conservation potential of various alternatives." 40 C.F.R. § 1502.16(e). This means the agency needs to engage in a comparative analysis of the amount of energy needed for each alternative, as well as the potential for conservation measures inherent in each option. *Id.* § 1502.16(f).

53.      In addition to analyzing the potential effects of different alternatives, an EIS must consider possible mitigation measures to reduce impacts to the environment.  *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

54.      NEPA includes specific procedural requirements: an agency must prepare a draft EIS and then request comments from other federal agencies, state, local, and tribal governments, the public, and other interested parties.  *See* 40 C.F.R. §§ 1503.1 *et seq.*  The agency must then assess and consider those comments in preparing the final EIS.

55.      In some circumstances, an agency may adopt an EIS prepared by another agency.  *See* 40 C.F.R. § 1506.3.  In such instances, the adopting agency must conduct its own independent review of the EIS.  *Id.* § 1506.3(c).

56.      After an agency has developed or adopted a final EIS and has reached a decision, it must prepare a "concise public record of decision."  40 C.F.R. § 1505.2.  The record of decision ("ROD") must state the decision, "identify all alternatives considered by the agency in reaching its decision," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  *Id.* § 1505.2(a)-(c).

### National Forest Management Act

57.      The National Forest Management Act of 1976 ("NFMA") was enacted in an effort to better manage the nation's forests and resources.  *See* 16 U.S.C. §§ 1600 *et seq.*

58.      NFMA directs the Forest Service, which has authority over the National Forest System, to assure that "the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity."  16 U.S.C. § 1600(6).

59.     In order to ensure the sustainable management of national forest lands, NFMA requires the development of "land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).

60.     The National Forest System consists of "federally owned forest, range, and unrelated lands throughout the United States," including "the national grasslands." 16 U.S.C. § 1609(a).

61.     The Thunder Basin National Grassland, which is an administrative unit of the Medicine Bow-Routt National Forest, is part of the National Forest System.

62.     Each land and resource management plan promulgated under NFMA must "recognize the fundamental need to protect and, where appropriate, improve the quality of soil, water, and air resources." 16 U.S.C. § 1602(5)(C). The plan must also "account for the effects of global climate change on forest and rangeland condition." *Id.* § 1602(5)(F).

63.     A land and resource management plan must specifically consider, among other things: (a) the economic and environmental aspects related to the management of renewable resources; (b) the need to provide for a diverse community of plant and animal species within a specific ecosystem; and (c) the effects of a management system on the area in question. *See* 16 U.S.C. § 1604(g)(3).

64.     Under NFMA, site-specific projects, and permits for the use of land within the National Forest System, must be consistent with the land and resources management plan for that area. 16 U.S.C. § 1604(i); *see also* 36 C.F.R. § 219.10.

65.     The Thunder Basin National Grassland Land and Resource Management Plan ("Grassland Plan" or "Plan"), developed in 2001, is the relevant plan under NFMA for the

protection of resources and sustainable use of the Grassland.  The purpose of the Plan is to guide "all resource management activities on the Thunder Basin National Grassland."  Grassland Plan at P-1.

66.     The Grassland Plan aims to "[p]romote ecosystem health and conservation." Grassland Plan at 1-2.  In furtherance of this goal, the Plan includes a series of standards and guidelines.  Standards are the strictest management requirements found within the Grassland Plan.  As the Plan explains, "[s]tandards are actions that must be followed or are required limits to activities in order to achieve Grassland objectives."  *Id.* at 1-9.  Any deviation from Grassland Plan standards must be analyzed and documented in an amendment to the Plan.  *Id.*

67.     The Grassland Plan establishes standards for the protection of air quality within the region.

68.     Among other provisions, the Plan includes a standard requiring the Forest Service to "[c]onduct all land management activities in such a manner as to comply with all applicable federal, state, and local air-quality standards and regulations including: Federal Clean Air Act." Grassland Plan at 1-9.

69.     A separate Grassland Plan standard requires the Forest Service to "[e]nsure emissions from projects on the Grassland . . . are within Class I or Class II ranges."  Grassland Plan at 1-9.

70.     The Clean Air Act establishes National Ambient Air Quality Standards ("NAAQS") for pollutants considered to be harmful to human health.  *See* 42 U.S.C. §§ 7401 *et seq.*  These "criteria pollutants" include nitrogen dioxide ("NO$_2$") and small particulate matter ("PM$_{2.5}$").  *See* 40 C.F.R. § 50.11; *id.* § 50.13.

71.     Areas such as the Grassland that have met the minimum requirements of the NAAQS are allowed only minimal increases in the level of these pollutants in order to prevent a significant deterioration of the air quality.  *See* 42 U.S.C. §§ 7470, 7472, 7473.

72.     The Grassland Plan also helps ensure that coal mining is performed in an environmentally responsible manner.  Indeed, one of the Plan objectives directs the Forest Service to "[e]nsure reclamation provisions of operating plans are completed to standard." Grassland Plan at 1-6.

### *Administrative Procedure Act*

73.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.

74.     Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id*. § 704.  In this case, the final agency action was the October 14, 2011 decision by Acting Deputy Regional Forester Glenn Casamassa, in which he denied Plaintiffs' administrative appeal of the South Porcupine consent decision.

75.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action. . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### *The Thunder Basin National Grassland*

76.     BLM is in the process of issuing a series of coal leases in northeastern Wyoming, in a region called the "Wright Area."  Of the six tracts included in BLM's coal leasing effort,

five of them – including the South Porcupine tract – are partially located within the Grassland. Collectively, these five tracts extend across 12,481 acres of the Grassland.

77.    The Grassland is biologically diverse.  It is home to numerous wildlife species, which are important to the region's ecological balance.  These species play vital roles as pollinators, decomposers, soil builders, nutrient cyclers, and important links in the food chain.

78.    The Grassland is home to big game species such as mule deer and pronghorn. Mule deer are an important link in the Grassland's food chain and provide hunting opportunities for outdoor enthusiasts.  Indeed, the Wyoming Game and Fish Department has designated the Wright Area – including the South Porcupine tract – as part of the Thunder Basin Mule Deer Herd Unit.  This designation recognizes that the mule deer is valuable to the area.

79.    The Thunder Basin National Grassland also serves as an important refuge for bird species.  Although the Great Plains support more than 300 bird species, many of these species' populations have declined precipitously due to habitat degradation and fragmentation.  This loss of habitat bolsters the importance of the remaining habitat areas, like those found in the Wright Area and the Grassland generally.

80.    The Grassland, including the Wright Area, is particularly important for raptors. Indeed, there are more than 30 intact raptor nests within 2 miles of the South Porcupine tract alone.  Raptor species found within the Wright Area include the golden eagle, red-tailed hawk, Swainson's hawk, rough-legged hawk, northern harrier, American kestrel, prairie falcon, great horned owl, burrowing owl, short-eared owl, and ferruginous hawk.  The bald eagle is a frequent winter resident in this region.

81.     The Grassland also supports an array of sensitive plant and animal species.  The

Forest Service defines "sensitive species" as "[t]hose plant and animal species identified by a

regional forester for which population viability is a concern, as evidenced by . . . [s]ignificant

current or predicted downward trends in population numbers or density," or "[s]ignificant current

or predicted downward trends in habitat capability that would reduce a species' existing

distribution."  Forest Service Manual 2670.5.  Sensitive species located within the Wright Area

include the black-tailed prairie dog, swift fox, mountain plover, and greater sage-grouse.  Final

EIS at 2-73.  The ferruginous hawk and bald eagle are also Forest Service-designated sensitive

species.

82.     Prairie dogs are valuable grassland herbivores.  Many species rely on the prairie

dog population as a food source, such as the swift fox and ferruginous hawk, both of which are

sensitive species.  The prairie dog population has significantly declined in recent years.  In fact,

prairie dogs only exist in about two percent of their historic range.  The largest remaining

populations of prairie dogs exist on national grasslands.  The black-tailed prairie dog, which lives

in or near all six Wright Area tracts, is a sensitive species.

83.     The greater sage-grouse is a "species of concern" throughout the West and is an

identified priority conservation species by federal land management agencies, such as the Forest

Service and BLM.  The sage-grouse has also been listed as a candidate species under the

Endangered Species Act, which means that an endangered listing is warranted, but must be

temporarily withheld due to other listing priorities.  *See 12-Month Findings for Petitions to List

the Greater Sage-Grouse as Threatened or Endangered*, 75 Fed. Reg. 13910 (Mar. 23, 2010).

The sage-grouse depends on large expanses of unfragmented sagebrush habitat.  Such areas provide the habitat components necessary for the species' annual life cycle.

84.     The Grassland, which is open year-round for public use, is an important recreational resource for the residents of this region.  Among the activities Grassland visitors enjoy are hiking, biking, camping, horse riding, off-highway vehicle riding, fishing, and hunting.  Additionally, those areas within this region that remain unmarred by coal mining are beautiful and appealing to sightseers and photographers.  Recreation on public lands in the prairie ecosystem has increased dramatically in recent years.  The Forest Service attributes this to increased recognition of prairie land for hunting opportunities, increased public appreciation for the beauty of the prairie, more people taking short vacations to nearby public lands, and a loss of solitude in mountain areas.  United States Forest Service, Final Environmental Impact Statement for the Northern Great Plains Management Plans Revision at 1-18 (May 2001) ("Grassland Plan EIS").

85.     Ranching is also a significant enterprise in the Grassland.  Livestock grazing is a traditional use of many National Forest System lands, and individual and small family-owned ranching operations depend on the Grassland for their livelihoods.

86.     According to the Forest Service, the grassland ecosystems it administers, such as the Thunder Basin National Grassland, contribute "many trillions of dollars" in both economic and intangible value.  U.S. Forest Service, Ecosystem Services from Grasslands (Mar. 18, 2011), *available at* http://www.fs.fed.us/grasslands/ecoservices/index.shtml.  In an increasingly urbanized nation, grasslands maintain biodiversity, mitigate both drought and floods, generate and preserve soils, protect watersheds, harbor natural pollinators, provide wildlife habitat and

aesthetic beauty, and provide carbon sequestration, among other vital tasks.  The Forest Service

recognizes that "[n]atural ecosystems and the plants and animals within them provide humans

with services that would be very difficult to duplicate," and those services are "critical for

sustaining human well-being."  *Id*.

87.     Since the Forest Service is charged with managing the Grassland's vegetation and

wildlife, the fate of the area's biological diversity is in its hands. As the EIS for the Grassland

Plan points out, "maintaining biological diversity will help ensure [the Forest Service's] legal

mandates are met."  Grassland Plan EIS at 1-15.

### Coal Mining and the Wright Area Leases

88.     Although the Grassland boasts important wildlife habitat and other resources,

those resources are under constant threat from coal mining.  Indeed, the Powder River Basin

contains the largest coal surface mining operations in the nation.

89.     When an area is opened for coal surface mining in the Powder River Basin, the

mining company first removes the topsoil and subsoil.  The landscape is drilled and blasted, and

then trucks remove the soil and vegetation to expose the underlying coal.  At that point, whatever

existed on those lands prior to mining – wildlife habitat, grazing lands, etc. – is completely

destroyed.  After still more blasting, trucks haul the coal to trains used to transport it.

90.     Surface coal mining consumes large areas of land, thus affecting biodiversity and

reducing land available for grazing.  Coal mining also creates other environmental problems,

including soil erosion, pollution of ground and surface waters, and air pollution.

91.     BLM administers coal leasing where the federal government owns the coal, as it

does on the South Porcupine tract.  In September 2006, BTU Western Resources, Inc. ("BTU"),

a subsidiary of Peabody Energy Corporation, filed an application with BLM to lease federal coal reserves within the South Porcupine and North Porcupine tracts.  These tracts would expand, and extend the life of, the North Antelope Rochelle Mine.

92.     In October 2007, BTU filed a request with BLM to modify the configuration of the South Porcupine tract in order to increase the size of the lease area and the total volume of recoverable coal.

93.     Opening the South Porcupine and other Wright Area tracts to mining poses a danger to sensitive species of wildlife.  For example, the destruction of prairie dog colonies – an inevitable result of new mining activities – would not only kill numerous prairie dogs, but would also harm the ferruginous hawk, which depends on them as a food source.

94.     Wildlife species that must migrate to access food sources and breeding areas, such as the mule deer and pronghorn antelope, would also be restricted by the construction of fences and open coal pits.  Such obstructions will prevent these animals from passing through land that was once open to them.  Additionally, the Wright Area coal leases will directly destroy many raptors' nests, and the noise and debris associated with strip mining will cause others to abandon their nests.

95.     The Wright Area coal leases also pose a danger to the human population.  In addition to the loss of ecosystems and their ecological benefits, many of the air pollutants associated with coal mining, such as nitrogen oxides and particulate matter ("PM"), are known to cause serious health problems.

96.     The proposed Wright Area lease tracts will also render much of the area unusable to the public and the region's ranchers.  Mining of the tracts will render the area unfit for

grazing, which will cause a significant loss for area ranchers and their way of life.  Additionally, until reclamation occurs, and the area is released from bond, allowing it to be returned to its previous uses, the surface area will be completely unusable for hunting and recreation purposes.

97.     In addition to these local and regional impacts, the proposed Wright Area coal leases – including the South Porcupine lease – will negatively affect the global environment as well.  Once mined, the coal from these tracts will be burned in coal-fired power plants and other boilers, causing the release of massive quantities of carbon dioxide ("$CO_2$").  Indeed, the five Wright Area tracts located on the Grassland, which collectively contain more than three billion tons of coal, have the potential to produce five billion metric tons of $CO_2$.  Final EIS at 4-140. The South Porcupine tract alone will likely result in nearly 667 million metric tons of $CO_2$ emissions.  By way of comparison, according to the U.S. Environmental Protection Agency, the amount of $CO_2$ that the South Porcupine tract would produce equals the annual greenhouse gas emissions from 130,703,176 passenger vehicles or, put differently, the annual $CO_2$ emissions of 158 coal-fired power plants.  *See* U.S. EPA, Greenhouse Gas Equivalencies Calculator (last updated June 21, 2011), *available at* http://www.epa.gov/cleanenergy/energy-resources/calculator.html.

### *BLM's Environmental Impact Statement*

98.     Where, as here, BLM receives an application to lease a tract of federal coal, NEPA requires the agency to prepare an EIS to evaluate the environmental and socioeconomic impacts of that lease because the leasing, and subsequent mining, of federal coal is a major federal action significantly impacting the human environment.

99.     Here, BLM prepared a single EIS to cover the leases for all six Wright Area coal tracts (the North Hilight Field, South Hilight Field, West Hilight Field, West Jacobs Ranch, North Porcupine, and South Porcupine tracts).

100.     BLM issued the Draft EIS in July 2009.  A 60-day comment period followed. BLM received hundreds of e-mails and letters from interested and concerned parties, including Plaintiffs.  BLM issued the Final EIS in July 2010, and subsequently held another comment period.  Again, Plaintiffs submitted detailed comments on the Wright Area EIS.

101.     In their comments, Plaintiffs identified multiple legal problems with the EIS and suggested several alternatives to the proposed action.  One alternative proposed by Plaintiffs called for the federal agencies to delay the leases, or subject them to stipulations, in order to ensure that reclamation requirements are satisfied before additional coal mining begins.  For example, Plaintiffs asked the agencies to consider a lease stipulation that would prevent mining of a new area until a certain percentage of previously mined areas completed reclamation activities and obtained release from reclamation bonds.  This alternative would have addressed the problem of untimely reclamation within the region, helping achieve SMCRA's requirement that previously mined lands be reclaimed "as contemporaneously as practicable."  30 U.S.C. § 1265(b)(16).  By ensuring the restoration of previously mined areas prior to the commencement of new strip mining, this alternative would have reduced fragmentation of wildlife habitat and the long-term loss of grazing land.

102.     Plaintiffs also proposed an alternative that called for smaller tract sizes, thereby reducing the amount of coal to be leased.  This alternative would have mitigated the enormous greenhouse gas emissions associated with this project, as well as the other direct and indirect air

quality impacts of these proposed coal mines.  This alternative also would have helped to address

the lack of contemporaneous reclamation in the region, thereby protecting grazing land and

wildlife habitat.

103.    The Wright Area EIS, however, fails to consider either of these reasonable

alternatives.  Other than the No-Action Alternative, the EIS analyzes only two alternatives for

the South Porcupine tract: the proposed action, which would lease the South Porcupine tract as

applied for by BTU; and Alternative 2, BLM's preferred alternative, which calls for even more

coal mining than BTU's original proposal.

104.    In the EIS, BLM responded to some of Plaintiffs' comments regarding the Draft

EIS's legal inadequacies, but did nothing to remedy them.  For example, although Plaintiffs

explained that the proposed action had serious climate change implications, and that BLM had a

duty to consider reasonable alternatives that would result in fewer greenhouse gas emissions,

such as reducing the size of the lease tracts, the EIS fails to consider any such alternative.  BLM

responded to Plaintiffs' comments by simply referring to the section of the Final EIS that

discusses greenhouse gas emissions and urging concerned parties to "review our analyses and

disclosure of impacts."  Final EIS, Appx. I, Response to Comments at 4.

### The Forest Service Consent Decision

105.    When lease tracts contain surface lands under the jurisdiction of another federal

agency, such as the Forest Service, that agency must independently review, and, if appropriate,

consent to, the leasing decision.  30 U.S.C. § 201(a)(3)(A)(iii); 43 C.F.R. § 3427.1.

106.    Of the six Wright Area tracts, five of them, including the South Porcupine tract,

are located partly on the Grassland.  Approximately 1,638 acres of the South Porcupine tract are

located on National Forest System lands.  As the surface owner, the Forest Service must consent

to the South Porcupine coal lease before BLM may issue the lease.  The Forest Service's consent

authority imposes a duty on the agency to perform its own environmental analysis and ensure

that NEPA, NFMA, SMCRA, and other legal requirements are and will be met.  If those legal

requirements have not been met, or if the evidence demonstrates that the requirements will not be

met in the future, the Forest Service cannot lawfully consent to the coal lease.

107.    In its haste to sign off on the Wright Area leases, the Forest Service issued its first

consent decision, for the South Hilight Field tract, without providing the public an opportunity to

comment.  The Forest Service issued the South Hilight consent decision in December 2010.

108.    Plaintiffs subsequently appealed that decision, and in March 2011, the Deputy

Regional Forester reversed the South Hilight consent decision because the agency had failed to

provide the legally-mandated comment period.  *See* 36 C.F.R. Part 215.

109.    Following the Deputy Regional Forester's decision, in April 2011, the Forest

Service opened up a 45-day comment period for its proposal to consent to the Wright Area

leases.

110.    In their comments on the proposed consent decisions, Plaintiffs restated many of

the comments they had made on the Wright Area EIS, including concerns about the Forest

Service's failure to adequately analyze alternatives and mitigation measures.

111.    Despite Plaintiffs' comments, the Forest Service issued a Record of Decision

("ROD") for the South Porcupine tract on July 14, 2011.  Although the Forest Service relied on

BLM's EIS in issuing its consent decision, the Forest Service did not conduct an independent

review of the EIS.  *Cf.* 40 C.F.R. § 1506.3(c) (requiring cooperating agencies to perform an independent review of an EIS before adopting it).

112.    The Forest Service, through its South Porcupine ROD, consented to Alternative 2 of the Final EIS, which calls for each tract to be subject to a competitive coal lease sale. Alternative 2 assumes that BTU will be the successful bidder.  This alternative would result in the mining of even more coal than BTU originally applied for.

113.    The South Porcupine ROD relies heavily on the Final EIS in its discussion of threatened, endangered, and sensitive species.  In its discussion of air quality, the ROD states that air quality impacts will be monitored in the context of other agencies' regulations.  Despite its recognition that there will be groundwater impacts from this mine, the ROD does not address mitigation measures.  Similarly, while recognizing that loss of grazing land will seriously affect family ranches, the ROD does not quantify the loss and does not discuss mitigation.

114.    Incredibly, despite the enormous amount of coal contained in the South Porcupine tract, the ROD asserts that this lease "would not result in the creation of new sources of human-caused greenhouse gas or mercury emissions."  ROD at 28.

115.    According to the ROD, the effect of rejecting the South Porcupine lease application would be inconsequential, because other domestic producers would generate the same amount of coal that would have been produced by this mine.  According to the ROD, even if the South Porcupine lease is rejected, "[o]ther national coal producers have the capacity to produce coal and replace the production from this existing mine."  ROD at 8; *see also* Wright Area Final EIS at 4-141 ("It is not likely that selection of the No Action alternative would result in a decrease of U.S. $CO_2$ emissions attributable to coal mining and coal-burning power plants in

the longer term[.]").  The Forest Service fails to provide any analysis or cite to any information to support this remarkable assertion.

116.    The North Antelope Rochelle Mine is one of the largest coal mines in the United States, producing more coal than any other mine.  It is unclear how the production capacity of this mine could be replaced given that no other mine produces as much coal.  Moreover, the Powder River Basin produces more coal than any other region, and in 2009, the North Antelope Rochelle Mine produced more than 21% of the Basin's total coal production.  It strains credulity to assume that more than 21% of the coal produced in the largest coal producing region in the country could be easily replaced.

117.    In Appendix C of the ROD, the Forest Service purported to respond to comments from Plaintiffs and others.  The Forest Service put the comments into a table and provided brief answers to them.  Many of the responses to Plaintiffs' comments were conclusory, referring back to the Wright Area EIS, deferring to other agencies, or stating that the concern was "outside the scope of the project."

### Deficiencies in the Wright Area EIS and South Porcupine Consent Decision

118.    Plaintiffs have participated in every step of the NEPA process, voicing concerns about the legal inadequacies of the Wright Area EIS and South Porcupine consent decision.  By consenting to the South Porcupine coal lease, the Forest Service breached its duties under NEPA and NFMA in at least five major respects:

**A.  Alternatives Analysis**

119.    The Wright Area EIS and South Porcupine ROD fail to consider a reasonable range of alternatives.  Other than the No-Action Alternative, the EIS only considered two

alternatives in any detail: BTU's original proposal, and Alternative 2, a reconfiguration of the South Porcupine tract that would allow even more coal mining than BTU's proposal.  Final EIS at 2-57 to -65.

120.    During the EIS process, Plaintiffs suggested a number of reasonable alternatives. One such alternative was to make the effective lease date or final approval of mining contingent on the successful reclamation of other tracts of previously mined lands in the area.  By reducing the number of acres subject to mining activities at a given time, this alternative would have addressed the problem of untimely reclamation, thereby helping achieve SMCRA's contemporaneous reclamation requirement.  *See* 30 U.S.C. § 1265(b)(16).  This alternative also would have reduced fragmentation of wildlife habitat and loss of grazing land, and mitigated greenhouse gas emissions.

121.    Plaintiffs also proposed an alternative that called for smaller tract sizes.  This alternative would have mitigated the massive greenhouse gas emissions associated with this project, and reduced the other serious air quality impacts of the Wright Area mines.  By reducing the area subject to mining activities, this alternative also would have addressed the problem of lack of reclamation, protecting grazing land and wildlife habitat.

**B**.  **Groundwater Mitigation**

122.    Although the Wright Area EIS and South Porcupine ROD acknowledge that the proposed mining will negatively impact groundwater, they fail to discuss measures to mitigate those adverse effects.  *Cf.* 40 C.F.R. §§ 1502.16(h), 1502.14(f).

123.    In response to Plaintiffs' comments on this issue, BLM asserted in the EIS that further water studies and discussion of groundwater mitigation measures would be done at a later

date.  But because the South Porcupine consent decision is an irretrievable commitment of

resources, groundwater mitigation measures should have been discussed in the EIS and South

Porcupine ROD.

### C.  Air Quality Impacts

124.    The Wright Area EIS and the South Porcupine ROD fail to adequately analyze the

air quality impacts of the South Porcupine coal lease.  Specifically, BLM and the Forest Service

failed to assess this action's effect on emissions and concentrations of nitrogen dioxide ("$NO_2$")

and small-diameter particulate matter ("$PM_{2.5}$").

### i.        Nitrogen Dioxide ("$NO_2$")

125.    Nitrogen dioxide is "a highly reactive reddish brown gas that is heavier than air

and has a pungent odor."  Final EIS at 3-78.

126.    $NO_2$ can travel long distances and cause many health and environmental

problems, including ozone and smog.  $NO_2$ is "by far the most toxic of several species of

[nitrogen oxides]," and "may cause significant toxicity because of its ability to form nitric acid

with water in the eye, lung mucous membranes, and skin."  Final EIS at 3-78, 3-81.  The Wright

Area EIS notes that $NO_2$ "may exacerbate pre-existing respiratory conditions, or increase the

incidence of respiratory infections," and "may cause death by damaging the pulmonary system."

*Id.* at 3-78.

127.    $NO_2$ is a byproduct of coal mining activity.  As the EIS notes, blasting associated

with mining can result in the emission of $NO_2$ "as a result of the incomplete combustion of

nitrogen-based explosives used in the blasting process.  When this occurs, gaseous, orange-

colored clouds may be formed and they can drift or be blown off mine permit areas." Final EIS at 3-79.

128.    The Wright Area EIS acknowledges that "there is concern about the potential health risk associated with short-term exposure to $NO_2$ from blasting emissions." Final EIS at 3-81.

129.    The EIS, however, lacks any actual "hard look" analysis of the potential $NO_2$ emissions likely to result from the South Porcupine or other proposed coal leases.

   **ii.**  **PM$_{2.5}$**

130.    According to the EPA, "particle pollution is a mixture of microscopic solids and liquid droplets suspended in air." This pollution can include several components, including acids, organic chemicals, metals, soil or dust particles, and allergens.

131.    Particle pollution includes both large-diameter particulate matter ("$PM_{10}$") and small-diameter particulate matter ($PM_{2.5}$). $PM_{10}$ is particulate matter with a diameter of 10 micrometers or less. Exposure to $PM_{10}$ – a byproduct of coal combustion – can have effects on breathing and respiratory systems. It can cause damage to lung tissue, cancer, and premature death. $PM_{10}$ is also a major cause of reduced visibility.

132.    $PM_{2.5}$ is particulate matter that is 2.5 micrometers in diameter and smaller. There is a significant link between exposure to $PM_{2.5}$ and premature death from heart or lung disease. $PM_{2.5}$ can cause cardio arrhythmias, heart attacks, respiratory symptoms, asthma attacks, and bronchitis.

133.    $PM_{2.5}$ is emitted during blasting activities associate with coal mining, as well as from coal combustion.

134.     The Clean Air Act establishes National Ambient Air Quality Standards ("NAAQS") for pollutants considered to be harmful to human health, including $PM_{2.5}$. *See* 42 U.S.C. §§ 7401 *et seq.*

135.     The primary annual NAAQS for $PM_{2.5}$ is 15.0 micrograms per cubic meter average concentration in the ambient air.  40 C.F.R. § 50.13(a).  This means that the annual mean concentration of $PM_{2.5}$ must be less than or equal to 15.0 micrograms per cubic meter. *Id.* § 50.13(b).  The primary 24-hour NAAQS for $PM_{2.5}$ is 35 microgram per cubic meter average concentration in the ambient air. *Id.* § 50.13(a).

136.     Neither the Wright Area EIS nor the South Porcupine ROD adequately analyze the degree to which the South Porcupine coal lease will affect annual and 24-hour $PM_{2.5}$ concentrations, or the potential impact those concentrations might have.

137.     Particularly concerning is the contradictory assertion in one part of the EIS implying that current $PM_{2.5}$ concentrations are below NAAQS, while the cumulative effects analysis of the EIS notes that current background $PM_{2.5}$ concentrations are exceeding the 24-hour NAAQS and are projected to exceed both the annual and 24-hour NAAQS. *Compare* Final EIS at 3-50 *with id.* at 4-47.

138.     The Wright Area EIS further contradicts itself by disclosing that there are no $PM_{2.5}$ monitors in operation at the Black Thunder Mine, or the other mines applying for coal leases under the Wright Area EIS, despite stating that background $PM_{2.5}$ concentrations were established based on "[d]ata collected at the Black Thunder Mine." *See* Final EIS at 3-52 to 3-54, 3-50.  There are only $PM_{10}$ monitors in operation at the Black Thunder Mine. *Id.* at 3-51.

139.    Simply put, the Wright EIS and South Porcupine ROD fail to analyze the impacts the South Porcupine coal mine would have on both 24-hour and annual $PM_{2.5}$ concentrations in the region.

140.    Also, as described in paragraphs 163-64 below, the Forest Service failed to analyze impacts to the 24-hour $PM_{2.5}$ increments for Class I areas.

### D.  Indirect Air Quality Impacts

141.    Neither the Wright Area EIS nor the South Porcupine ROD adequately analyzes the indirect air quality impacts likely to result from the South Porcupine coal lease.

142.    One of the principal indirect effects of the South Porcupine coal lease, and the Forest Service's consent to that lease, are the emissions resulting from coal combustion at the power plants receiving coal from this proposed expansion of the North Antelope Rochelle Mine.

143.    Coal-fired power plants emit mercury, sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$"), $PM_{2.5}$, and $PM_{10}$, among other pollutants.  These pollutants, which are generated by coal combustion, negatively affect human health and the environment.

144.    Thus, in order to satisfy NEPA, the Forest Service and BLM were required to (a) thoroughly consider the environmental and health effects of power plant emissions resulting from this additional supply of coal, and (b) compare those estimated emissions under different alternatives.  *See* 40 C.F.R. §§ 1502.14, 1502.16.

145.    The EIS includes a few brief mentions of mercury emissions.  *See* Final EIS at 4-151 to 4-154.  But the EIS fails to analyze the environmental, health, and economic impacts of mercury emissions that will result from the combustion of South Porcupine coal.

146.     And the Wright Area EIS and South Porcupine ROD fail entirely to consider the indirect impacts of $SO_2$, $NO_x$, $PM_{2.5}$, and $PM_{10}$ emissions from coal-fired power plants under different alternatives.

**E.  Grassland Plan Standards**

147.     Under NFMA, the Forest Service has a duty to ensure that its actions are consistent with the Grassland Plan.  *See* 16 U.S.C. § 1604(i).  In consenting to the South Porcupine coal lease, the Forest Service failed to ensure compliance with the substantive air quality standards in the Grassland Plan.

148.     As noted above, the Grassland Plan contains standards requiring the Forest Service to "[c]onduct all land management activities in such a manner as to comply with all applicable federal, state, and local air-quality standards and regulations including: Federal Clean Air Act," and "[e]nsure emissions from projects on the Grassland and forest management activities are within Class I or Class II ranges."  Grassland Plan at 1-9.

149.     The Forest Service failed to comply with these standards in two primary ways: (1) by failing to even analyze certain air quality impacts, and (2) by approving the South Porcupine coal lease knowing that emissions from the lease, when combined with current and reasonably foreseeable emissions, will likely result in violation of federal air quality standards.

150.     In particular, the Forest Service failed to discuss the air quality impacts of $NO_2$ and $PM_{2.5}$ from the South Porcupine coal lease.

151.     First, the Forest Service failed to analyze the impacts caused by the South Porcupine coal lease in the Wyoming portion of the Powder River Basin to the recently-adopted 1-hour $NO_2$ NAAQS.

152.     The U.S. Environmental Protection Agency has set primary National Ambient Air Quality Standards ("NAAQS") for both annual and 1-hour $NO_2$ concentrations.  40 C.F.R. § 50.11.  Primary ambient air quality standards are defined as "levels of air quality which . . . are necessary, with an adequate margin of safety, to protect the public health."  40 C.F.R. § 50.2(b).

153.     The U.S. EPA set a new 1-hour $NO_2$ standard in 2010.

154.     The 1-hour primary NAAQS for $NO_2$ is 100 parts per billion ("ppb").  40 C.F.R. § 50.11(b).  This means that in order to protect public health, the average concentration of $NO_2$ in the ambient air needs to be less than, or equal to, 100 ppb.

155.     The annual primary NAAQS for $NO_2$ is 53 ppb.  40 C.F.R. § 50.11(a).

156.     The Wright Area EIS recognizes that, on a cumulative basis, hourly concentrations of $NO_2$ in Montana will exceed the NAAQS, stating "the modeling results indicate that the 1-hour $NO_2$ concentrations . . . for 2020 would exceed EPA's new 1-hour NAAQS," meaning that while the EIS does model this pollutant for Montana, it fails to apply the same information to Wyoming.  Final EIS at 4-48.

157.     Despite the strong possibility that $NO_2$ concentrations will violate federal air quality standards, the Forest Service made no attempt to analyze the impacts of the South Porcupine coal lease on the 1-hour $NO_2$ NAAQS in Wyoming, and whether its consent decision ensures compliance with the annual and 1-hour NAAQS.  The Forest Service's failure to do so violates Grassland Plan standards and NFMA.

158.     Second, the Forest Service failed to adequately analyze the impacts to the 24-hour $PM_{2.5}$ NAAQS.

159.    The Wright Area EIS indicates that, on a cumulative basis, the development of the South Porcupine lease will exceed the annual and 24-hour $PM_{2.5}$ NAAQS.  *See* Final EIS at 4-47.

160.    The Final EIS also discloses that there are no $PM_{2.5}$ monitors in operation at the Black Thunder Mine, or on any of the mines applying for coal leases under the Wright Area Coal FEIS.  *See* Final EIS at 3-52 to 3-54.

161.    Despite stating that background $PM_{2.5}$ concentrations were established based on "[d]ata collected at the Black Thunder Mine," the EIS goes on to show that there are only $PM_{10}$ monitors in operation at the mine.  *See* Final EIS at 3-52.

162.    The Forest Service has a duty under the Grassland Plan to ensure the protection of federal air quality standards, *i.e.*, to protect against future exceedances of the annual and 24-hour $PM_{2.5}$ NAAQS.  By failing to ensure that the South Porcupine coal lease will comply with the $PM_{2.5}$ NAAQS, the Forest Service failed to comply with the requirements of the Grassland Plan.

163.    Likewise, the Forest Service failed to analyze impacts to the 24-hour $PM_{2.5}$ increments for Class I areas.  Increments are similar to the NAAQS, although they apply based on whether a geographic area is designated as Class I or Class II.  In this case, the EPA adopted Class I increments for 24-hour $PM_{2.5}$ on October 20, 2010, limiting concentrations to no more than 2 micrograms per cubic meter.  *See* 75 Fed. Reg. 64864.  Despite this, there is no analysis or assessment of the impacts of the South Porcupine coal lease on the 24-hour $PM_{2.5}$ increment.

164.    This lack of analysis, coupled with the fact that the Wright Area EIS and modeling prepared by BLM indicate that exceedances of the 24-hour $PM_{2.5}$ Class I increments are already occurring in three Class I areas – the Northern Cheyenne Indian Reservation, Badlands National Park, and Wind Cave National Park – demonstrates that the Forest Service

failed to comply with Grassland Plan standards that require the agency to protect federal air quality standards, as well as ensure emissions are within Class I ranges. *See* Grassland Plan at 1-9. The Forest Service's failure to analyze these impacts is also a violation of NEPA. *See* 40 C.F.R. § 1508.8(a).

### *Plaintiffs' Administrative Appeal*

165. On August 27, 2011, Plaintiffs filed a timely Administrative Appeal of the South Porcupine Record of Decision pursuant to 36 C.F.R. § 215.

166. In the Appeal, Plaintiffs challenged the failure of the Wright Area EIS and the South Porcupine ROD to consider a range of reasonable alternatives and to analyze and provide for mitigation of climate change and other air quality impacts. The Appeal also addressed concerns regarding the failure of the Wright Area EIS to comply with contemporaneous reclamation requirements and mitigate groundwater impacts.

167. On October 3, 2011, Plaintiffs held an informal resolution meeting with Forest Supervisor Phil Cruz, as well as other Forest Service officials, pursuant to 36 C.F.R. § 215.17. The parties were unable to resolve Plaintiffs' Appeal.

168. On October 11, 2011, Glenn Casamassa, the Acting Deputy Regional Forester for Resources and the Appeal Deciding Officer, issued a decision on Plaintiffs' Appeal (hereafter "Appeal Decision"). The Appeal Decision affirmed the Forest Service's lease consent for the South Porcupine tract and denied all relief requested in the appeal.

169. Mr. Casamassa's letter acknowledges that the Appeal Decision constitutes a final administrative determination. *See* 36 C.F.R. § 215.18(c). The Appeal Decision therefore

represents the Forest Service's final agency action for purposes of judicial review.  *See id.* §

215.21.

170.    In the Appeal Decision, the Forest Service claimed that it had analyzed all

reasonable alternatives and mitigation measures.  It quoted the Final EIS in support of its

position:  "[T]he EIS is not intended to be an environmental analysis of the numerous

technologies that are capable of producing electricity."  United States Forest Service, ARO

Recommendation – South Porcupine Lease by Application (WYW176095), Appeal #MBR 11-

02-00-048-215 Douglas Ranger District, Medicine Bow-Routt National Forests & Thunder Basin

National Grassland at 11 (Oct. 11, 2011).

171.    The Forest Service also claimed that climate change and alternatives that would

help minimize climate change were adequately addressed.  The Forest Service asserted that

under 40 C.F.R. § 1502.22, it was excused from providing a complete analysis of the climate

change impacts because of incomplete or unavailable information regarding the use of the coal

after it is mined.  The Forest Service made this claim despite its admission in the Appeal

Decision that "[a]lmost all of the coal mined in the Powder River Basin is being used by coal-

fired power plants to generate electricity."  *Id.* at 18.

172.    The Forest Service additionally stated that the duty of complying with air quality

regulations is left to other agencies, which ignores (a) its ability to prevent air pollution by

placing stipulations on the South Porcupine coal lease, and (b) its legal duty to ensure that all

land management activities on the Grassland are conducted "in such a manner as to comply with

all applicable federal, state, and local air-quality standards and regulations," including the Clean

Air Act.  Grassland Plan at 1-9.

173.    In response to Plaintiffs' concerns regarding the lack of contemporaneous reclamation, the Forest Service argued that it had adequately analyzed the reclamation issue, and that it does not have primary authority to regulate reclamation.

174.    Finally, regarding groundwater mitigation, the Forest Service conceded its failure to analyze mitigation alternatives, but insisted that the analysis has been properly deferred until a later date.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
*(SMCRA – Approval of Surface Coal Mining in Violation of 30 U.S.C. § 1272(e)(2))*

175.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

176.    SMCRA restricts surface coal mining on federal lands within the boundaries of any national forest.  30 U.S.C. § 1272(e)(2).

177.    Coal mining is only permitted on these lands if the Secretary of the Interior finds that they lack "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations."  *Id.*  Additionally, for national forest lands that are without significant forest cover and west of the 100th meridian – like the Thunder Basin National Grassland – coal mining is prohibited unless the Secretary of Agriculture first determines that surface mining on those lands is in compliance with a variety of federal laws, including the Multiple-Use Sustained-Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1976, and the National Forest Management Act of 1976.  *Id.* § 1272(e)(2)(B).

178.    The Thunder Basin National Grassland is an administrative unit of the Medicine Bow-Routt National Forest and part of the National Forest System.

179.    Consequently, the Grassland is entitled to the protections set forth in 30 U.S.C. § 1272(e)(2).

180.    The Forest Service issued the South Porcupine Record of Decision without the required findings from the Secretary of Agriculture and the Secretary of the Interior.  The Forest Service therefore did not have authority to consent to the South Porcupine coal lease.

181.    Because the Forest Service violated SMCRA by consenting to the South Porcupine coal lease without the required Secretarial findings, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
*(NEPA – Failure to Consider a Reasonable Range of Alternatives)*

182.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

183.    NEPA requires federal agencies to "rigorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).  When eliminating an alternative from detailed evaluation, the agency must "briefly discuss the reasons for their having been eliminated."  *Id.*  This discussion of alternatives is the "heart" of the EIS.  *Id.* § 1502.14.

184.    Neither the Wright Area EIS nor the South Porcupine ROD adequately discuss or analyze a range of reasonable alternatives.

185.    Plaintiffs proposed two reasonable alternatives, in particular, that should have been analyzed in the Wright EIS and South Porcupine ROD: (1) an alternative in which the

South Porcupine lease would be delayed, or stipulations on mining imposed, pending the completion of reclamation efforts on previously mined tracts; and (2) an alternative providing for a reduced tract size in order to address to greenhouse gas emissions and reclamation concerns.

186.    Instead, the Wright Area EIS and the South Porcupine ROD provide an in-depth analysis of only two action alternatives: (1) the original proposal made by BTU Resources; and (2) Alternative 2 (BLM's preferred alternative), a reconfiguration of the South Porcupine tract that would result in the destruction of even more grassland and the mining of even more coal than BTU's original proposal.

187.    Accordingly, the Forest Service has failed to "rigorously explore and objectively evaluate" all reasonable alternatives.  40 C.F.R. § 1502.14(a).

188.    Because the Forest Service violated NEPA by failing to consider all reasonable alternatives, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
*(NEPA – Failure to Discuss Groundwater Mitigation Measures)*

189.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

190.    Under NEPA, an agency is required to conduct a thorough analysis of both environmental impacts and possible mitigation measures.  40 C.F.R. §§ 1502.14, 1502.14(f).

191.    The Forest Service failed to adequately consider mitigation measures for groundwater impacts likely to result from the South Porcupine coal lease.

192.    The Wright Area EIS indicates that significant site-specific and cumulative impacts to groundwater resources are likely to result from the coal lease, and that substantial and irreparable impacts to aquifers are likely to result from this coal mine.

193.    In the South Porcupine ROD, the Forest Service further recognizes the detrimental impacts surface coal mining has on groundwater.  It states that mining activities impact the quantity of groundwater in two ways: (1) "the coal aquifer and any water-bearing overburden strata on the mined lands are removed and replaced with unconsolidated backfill"; and (2) "water levels in the coal and overburden aquifers . . . are depressed as a result of seepage into and dewatering from the open excavations in the area . . . ."  ROD at 22.  The Forest Service further states that if the South Porcupine tract is leased, "the area of coal removal and reclamation would increase, which would result in an increase in the area of impacts to groundwater quantity."  *Id.*

194.    Despite recognizing such impacts, neither the Wright Area EIS nor the South Porcupine ROD discuss groundwater mitigation measures.  Accordingly, the Forest Service violated NEPA by failing to analyze mitigation measures.  *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

195.    Because the Forest Service violated NEPA by failing to discuss groundwater mitigation measures, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
*(NEPA – Failure to Consider Direct Air Quality Impacts)*

196.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

197.    Under NEPA, an agency is required to provide a thorough consideration of the direct effects of a proposed action.  40 C.F.R. §§ 1502.16(a), 1508.8.  Direct effects are defined as those that "are caused by the action and occur at the same time and place."  *Id*. § 1508.8(a).

198.    Neither the Wright Area EIS nor the South Porcupine ROD adequately discuss or analyze the potential direct air quality impacts of the South Porcupine lease.  Specifically, these documents fail to assess the impact of increased $NO_2$ and $PM_{2.5}$ emissions in the area.

199.    The Wright Area EIS acknowledges the "concern about the potential health risk associated with short-term exposure to $NO_2$ from blasting emissions."  Final EIS at 3-81.  Furthermore, the EIS recognizes that, on a cumulative basis, hourly concentrations of $NO_2$ will exceed the NAAQS, stating "the modeling results indicate that the 1-hour $NO_2$ concentrations . . . for 2020 would exceed EPA's new 1-hour NAAQS."  *Id.* at 4-48.

200.    What the Wright Area EIS and the South Porcupine ROD lack, however, is any analysis of the impacts that the South Porcupine coal lease will have on $NO_2$ concentrations in the region.

201.    Neither the Wright Area EIS nor the South Porcupine ROD adequately analyze the potential impacts the South Porcupine coal lease will have on $PM_{2.5}$ emissions.  The EIS admits that there are no $PM_{2.5}$ sensors at any of the mines applying for coal leases under the Wright Area EIS.  Final EIS at 3-52 to 3-54.  And the South Porcupine ROD fails entirely to analyze $PM_{2.5}$ impacts.

202.    Accordingly, the Forest Service violated NEPA because it failed to adequately analyze the impacts of the South Porcupine mine's emissions and the resulting concentrations of $NO_2$ and $PM_{2.5}$.  *See* 40 C.F.R. § 1508.8(a).

203.    Because the Forest Service violated NEPA by failing to provide an adequate analysis of air quality impacts, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
*(NEPA – Failure to Assess Indirect Air Quality Impacts)*

204.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

205.    NEPA requires that an agency analyze the indirect impacts of a proposed action and its alternatives.  40 C.F.R. §§ 1502.16(a), 1508.8(b).  Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).  They may include "effects on air and water and other natural systems, including ecosystems." *Id.*  This analysis must be comparative, meaning that there must be a robust comparison of the indirect impacts of different alternatives.  *Id.* §§ 1502.14, 1502.16.

206.    Neither the Wright Area EIS nor the South Porcupine ROD provides an adequate discussion and analysis of the potential indirect air quality impacts of the South Porcupine consent decision.  The EIS and ROD lack any discussion of the effects of mercury, $SO_2$, $NO_x$, $PM_{10}$, $PM_{2.5}$, and other emissions that will result from the combustion of South Porcupine coal.

207.    Thus, the Forest Service violated NEPA through its failure to provide an adequate analysis of the South Porcupine ROD's indirect air quality impacts.  *See, e.g.*, 40 C.F.R. § 1508.8(b).

208.    Because the Forest Service violated NEPA by failing to provide an adequate analysis of indirect air quality impacts, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### SIXTH CAUSE OF ACTION
*(NFMA- Failure to Comply with Grassland Plan Air Quality Standards)*

209.    Plaintiffs restate and incorporate by reference the allegations set forth in paragraphs 1-174 of this Complaint.

210.    Under NFMA, the Forest Service is required to develop and implement a land and resource management plan that must "recognize the fundamental need to protect and, where appropriate, improve the quality of soil, water, and air resources."  16 U.S.C. §§ 1602(5)(C), 1604.

211.    The Forest Service promulgated the Thunder Basin National Grassland Land and Resource Management Plan ("Grassland Plan") in order to govern the management of land and resources in the Thunder Basin National Grassland, as mandated by NFMA.

212.    The Grassland Plan establishes strict requirements for the protection of air quality within the region.  It contains standards requiring that the Forest Service (1) "[c]onduct all land management activities in such a manner as to comply with all applicable federal, state, and local air-quality standards and regulations including: Federal Clean Air Act"; and (2) "[e]nsure

emissions from projects on the Grassland and forest management activities are within Class I or Class II ranges."  Grassland Plan at 1-9.

213.    The Forest Service failed to comply with these standards in two respects: (1) by failing to even analyze certain air quality impacts, and (2) by approving the South Porcupine coal lease knowing that the emissions from the lease, when combined with current and reasonably foreseeable emissions, likely will result in significant deterioration of air quality and violations of National Ambient Air Quality Standards ("NAAQS").

214.    Despite the Grassland Plan's requirements, neither the Wright Area EIS nor the South Porcupine ROD provide a discussion or analysis of the impacts this increased coal mining would have on compliance with the recently adopted 1-hour $NO_2$ NAAQS in the Wyoming portion of the Powder River Basin.

215.    Neither the Wright Area EIS nor the South Porcupine ROD provide a discussion or analysis of the impacts the proposed coal mining would have on compliance with the annual and 24-hour $PM_{2.5}$ NAAQS despite the Grassland Plan's requirement that the Forest Service comply with federal air quality standards, and despite evidence indicating that the NAAQS wil be exceeded.

216.    Consequently, the Forest Service violated NFMA by failing to ensure that the air quality impacts of the proposed action would satisfy the Grassland Plan standards.

217.    Because the Forest Service violated NFMA by failing to ensure compliance with the air quality standards set forth in the Grassland Plan, the South Porcupine Record of Decision and the Appeal Decision are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that the Forest Service's actions are in violation of SMCRA, NEPA, NFMA, and the APA.

2.      Set aside the Forest Service's decision consenting to the lease of the South Porcupine tract until such time as the Forest Service comes into compliance with SMCRA, NEPA, NFMA, and the APA;

3.      Enjoin the Forest Service from consenting to the coal lease of the South Porcupine tract until such time as the Forest Service has complied with SMCRA, NEPA, NFMA, and the APA.

4.      Award Plaintiffs costs of litigation, including reasonable attorneys' fees, as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 and other applicable law; and

5.      Grant Plaintiffs such other relief as the Court may deem just and proper.

Dated:   December 6, 2011

s/ Michael C. Soules
Michael C. Soules, Colo. Bar No. 43474
Natural Resources Clinic
University of Colorado Law School
Wolf Law Building, UCB 404
Boulder, CO 80309-0404
(303) 492-5897
michael.soules@colorado.edu

*Counsel for Plaintiffs WildEarth Guardians,
Powder River Basin Resource Council, and
the Sierra Club*

**WildEarth Guardians**
516 Alto Street
Santa Fe, NM 87501

1536 Wynkoop, Suite 301
Denver, CO 80202
(303) 573-4898

**Powder River Basin Resource Council**
934 North Main Street
Sheridan, WY 82801
(307) 672-5809

**Sierra Club**
85 Second Street, 2nd Floor
San Francisco, CA 94105

1650 38th St., Suite 102W
Boulder, CO 80301
(303) 449-5595