UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

_____

|  |  |  |
|---|---|---|
| WILDEARTH GUARDIANS; POWDER RIVER BASIN RESOURCE COUNCIL; and SIERRA CLUB, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 1:11-cv-03171-JLK-AP<br>Honorable John L. Kane |
| UNITED STATES FOREST SERVICE; THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service; MARIBETH GUSTAFSON, in her official capacity as the Acting Regional Forester of United States Forest Service; and GLENN CASAMASSA, in his official capacity as the Acting Deputy Regional Forester of United States Forest Service, | ) ) ) ) ) ) ) ) ) | |
| Federal Defendants. | ) ) | |

_____

_____

**FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO TRANSFER VENUE TO THE DISTRICT OF WYOMING**

_____

TABLE OF CONTENTS

ARGUMENT ....................................................................................................................... 1

    1.    Plaintiffs' Choice Of Forum Is Entitled To Minimal Weight ................................. 3

    2.    The Local Interest Heavily Favors Transfer Because This Case Will Most Directly Affect Wyoming Residents ........................................................................ 5

        a.    Wyoming's Substantial Regulatory Authority Over, And Economic Reliance On, The Project Supports Transfer ................................................. 6

        b.    The Involvement Of Wyoming Citizens In The Public Process Also Establishes that Transfer is Warranted. ....................................................... 7

        c.    Neither The Transport Of Powder River Basin Coal Across The Country Nor Air Quality Impacts Mean That This Wyoming-Based Project Should Be Heard Outside of Wyoming ................................................................. 8

    3.    The Other *Chrysler* Factors are Neutral or Support Transfer ............................. 10

CONCLUSION ................................................................................................................. 14

Plaintiffs challenge a United States Forest Service ("Forest Service") consent decision to a project lying entirely in the state of Wyoming; involving work on-the-ground by Forest Service officials in Wyoming; decided by Wyoming-based Forest Service officials (except at the stage of administrative appeal); and for which the State of Wyoming will have significant regulatory role. Plaintiffs, however, contend that Colorado is the most convenient forum because one employee resides here as does counsel.  But the convenience of one of Plaintiffs' employees and counsel cannot override the other public and private interest factors including Wyoming's compelling interest in this controversy.  For these reasons and those explained in detail below, the Court should grant Federal Defendants' motion and transfer this case to the District of Wyoming.

## ARGUMENT

Plaintiffs challenge the Forest Service's consent decision related to the South Porcupine lease for surface coal mining in the Thunder Basin National Grassland ("Grassland") in the Powder River Basin of Wyoming.[1]  The allegations in the Complaint focus on the Grassland: Plaintiffs' members "actively and regularly utilize and enjoy the Thunder Basin National Grassland"; they have been "working for the preservation and enrichment of Wyoming's agricultural heritage"; "they are dedicated to preserving the quality of the land, mineral, water and air resources in Wyoming"; and the large number of Wyoming-based members.  Complaint ("Compl.") ¶¶ 22-25.  There is no dispute that none of the lands at issue in this lawsuit are located in Colorado.[2]  Nor is there any credible dispute that the vast majority of the

---

[1] The Thunder Basin National Grassland is managed as one part of the Medicine Bow, Routt National Forests and Thunder Basin National Grassland, which is headquartered in Laramie, Wyoming.  The part of the Grassland at issue in this Complaint is located in southeastern corner of Wyoming.

[2] Plaintiffs' statement that the Grasslands are an administrative unit of a National Forest with lands in Wyoming and Colorado is a red herring.  As noted above, the management of the Grasslands is located out of the Forest Service's office in Laramie, Wyoming.  The inclusion of

environmental analysis supporting the project occurred in Wyoming.  Indeed, the Complaint references Denver just once and it omits any direct reference to Colorado altogether.  Compl. ¶ 21.  In contrast, the Complaint contains allegations concerning Wyoming and the Powder River Basin on almost every page.[3]

Plaintiffs argue that Colorado is the appropriate forum for this case because the Forest Service signed the administrative appeal here and it is more convenient for Plaintiffs.  Pls.' Br. at 8.  Plaintiffs' emphasis on these factors is misplaced.  Because of the local character of Plaintiffs' claims, and applying the criteria for a transfer under the transfer statute, 28 U.S.C. § 1404[4], this action should be heard in a federal court sitting in Wyoming.  *Latin Americans for Social and Econ. Dev. v. the Administrator of the Federal Highway Admin.*, 1:09-cv-00897-EGS, at 16-17 (D.D.C. Nov. 30, 2009), attached as Ex. D. (finding in an action involving an international bridge, that the private and public interest factors weigh in favor of transfer to the Eastern District of Michigan and noting that dispute was localized in character).

---

the Grasslands into the Medicine Bow Unit is a matter of administrative convenience.  The Grasslands are not located in Colorado.

[3] *See, e.g.*, Compl. ¶¶ 4, 8, 13, 15, 21, 23, 25, 30, 61, 66, 71, 80, 81, 84, 87, 96, 99, 106.
[4] Under *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991), the relevant factors in determining a section 1404(a) motion for change of venue include:

> [1] the plaintiff's choice of forum; [2] the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; [3] the cost of making the necessary proof; [4] questions as to the enforceability of a judgment if one is obtained; [5] relative advantages and obstacles to a fair trial; [6] difficulties that may arise from congested dockets; [7] the possibility of the existence of questions arising in the area of conflict of laws; [8] the advantage of having a local court determine questions of local law; and [9] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Chrysler Credit Corp.*, 928 F.2d at 1516.

**1. Plaintiffs' Choice Of Forum Is Entitled To Minimal Weight.**

Plaintiffs argue that there is a strong presumption that their choice of forum should not be disturbed.  Not so.  "Contrary to the general presumption, Plaintiffs' preference for pursuing this action in this district is entitled to little weight.  It is neither their principal place of business nor the place where the operative facts giving rise to the claims occurred."  *Friends of the Norbeck v. U.S. Forest Serv.* ("*Norbeck*"), No. 10-cv-2165-AP, 2010 WL 4137500, at 3 (D. Colo. Oct. 18, 2010); *see Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 464 F. Supp. 2d 1095, 1098 (D. Colo. 2006); *Bailey v. Union Pac. R.R.*, 364 F. Supp. 2d 1227, 1230 (D. Colo. 2005); *Bell v. Union Pac. R.R. Co.*, No. 07-cv-00209-PSF-PAC,  2007 WL 1851423, at *3 (D. Colo. June 27, 2007); *see also Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1168 (10th Cir. 2010).

First, no Plaintiff has a principal place of business in Colorado.  No Plaintiff is incorporated here.[5]  Compl. ¶¶ 21-22.  One Plaintiff has a principal place of business in Wyoming; while another has a Wyoming-based office with a sub-group focused on the Grassland.  *Norbeck*, 2010 WL 4137500 at *3; Compl. ¶¶ 23, 25; *see* Ex. C.  Nor do Plaintiffs allege that their members primarily reside in the District of Colorado.  Rather, Plaintiffs maintain that WildEarth Guardians has an office in Colorado where Mr. Nichols, an employee Plaintiffs contend drafted their comments on the project, resides.  Pls.' Br. at 8-9.  But Mr. Nichols is not a Plaintiff to this action.  Where Mr. Nichols chose to prepare comments is not the proper analytical and factual focus in determining where the operative events related to the Forest

---

[5] WildEarth Guardians' state of legal domicile is New Mexico.  *See* Ex. B. Furthermore, while Affiant Nichols states that five WildEarth Guardian employees work in Colorado, WildEarth Guardians had 31 employees total, suggesting that the Colorado office is not its primary office. *Id.*  Nor is Mr. Nichols listed as a key officer for the organization in the organization's most recent Internal Revenue Service filing.  *Id.*  In short, Plaintiffs cannot credibly argue that WildEarth Guardians' primary "residence" as a legal matter is in Colorado.

Service's consent decision to the South Porcupine lease occurred.  Thus, Mr. Nichol's residence should not be afforded any weight in determining the appropriate venue for this litigation.

Second, the operative facts leading to Plaintiffs' claims almost exclusively occurred in Wyoming.  Put simply, there is no credible dispute that the vast majority of th*e project environmental review process occurred in Wyoming*.  For example, the original applications for the leases were made to the Bureau of Land Management ("BLM") Wyoming state office.  The entire public process preceding the Forest Service's consent decision occurred in Wyoming.  The environmental studies supporting the Forest Service Consent Decision (and BLM's Environmental Impact Statement ("EIS")) were conducted in Wyoming.  In addition, the Wyoming-based office of BLM served as the lead agency of the EIS.  The public meetings were held in Wyoming.  *See infra* at 8 (summarizing local notice).  Moreover, the draft National Environmental Policy Act ("NEPA") documents were issued there.  *See* Compl.  ¶¶ 76, 91, 100, 111.  The Forest Supervisor, who resides in Wyoming, signed the Record of Decision ("ROD") approving the consent decision in Wyoming.  Although the appeal deciding officer signed the final decision on Plaintiffs' administrative appeal in Colorado, that fact is not dispositive.[6] *Norbeck*, 2010 WL 4137500 at *3 n.2 (finding that most of the operative facts occurred in Federal Defendants' proposed forum, not Colorado, notwithstanding the fact that Region 2 Headquarters in Golden, Colorado signed the administrative appeal); *Airport Working Grp. v. United States Dep't of Def.*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002) (any role played by officials in D.C. was overshadowed by fact that permitting process, including public comments, occurred

---

[6]Although three of the federal defendants (who are sued in their official capacity) are located in Colorado, the only real connection those individuals have to this lawsuit is that the regional headquarters charged with generally regulating and overseeing the region is located in Colorado. This fact does not weigh in favor of venue in this district. *DeLoach v. Philip Morris Co.*, 132 F. Supp. 2d 22, 25 (D.D.C. 2000) (naming federal official insufficient to establish venue); *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 67 (D.D.C. 2003) (same).

in California).  Mindful of "considerations of convenience and justice," *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964), Wyoming is the most appropriate venue for this case to be heard.

> **2.  The Local Interest Heavily Favors Transfer Because This Case Will Most Directly Affect Wyoming Residents.**

Of paramount importance, Plaintiffs raise issues that will directly touch residents of Wyoming, affecting not only the local environment but also the local economy.  *South Utah Wilderness Alliance v. Norton,* 315 F. Supp. 2d 82, 88 (D.D.C. 2004) ("*SUWA*").  It is common ground that the local interest in having land management decisions heard in the jurisdiction where the land is located carries significant weight in determining whether the interest of justice favors transfer.  *Sierra Club v. U.S. Dep't of State*, No. C 09-04086 SI, 2009 WL 3112102, at * 3 (N.D. Cal. Sept. 23, 2009) ("Courts have observed that environmental cases often provide a particularly strong basis for finding a localized interest in the region touched by the challenged action."); *see also SUWA*, 315 F. Supp. 2d at 88-89 (transferring to Utah a case challenging decision to allow sale of oil and gas leases on Utah lands managed by the Bureau of Land Management); *Norbeck*, 2010 WL 4137500 at *4 (transferring case challenging Forest Service's wildlife project to South Dakota, where the project was located); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).

As discussed in Federal Defendants' opening brief, the Complaint is replete with allegations emphasizing the significance of the Grassland "to the people of the Powder River Basin." Compl. ¶4.[7]  Wyoming citizens' "rights and interests are in fact most vitally affected'" by the Forest Service consent decision to the South Porcupine lease tract.  *Trout Unlimited vs.*

---

[7] For example, the Complaint alleges, *inter alia*, that the Grassland provides: grazing land for ranchers, Compl. ¶¶ 4, 96, "abundant recreational opportunities" for the people of the Powder River Basin, and hosting "twenty rare plant communities," and habitat for "a variety of wildlife species." Compl. ¶¶3-4.  Furthermore, Plaintiffs allege that BLM has not ensured the timely reclamation of the Powder River Basin's existing coal mines.  Compl. ¶14.

*United States Dep't of Agric.*, 944 F. Supp. 13, 19-20 (D.D.C. 1996); *Norbeck*, 2010 WL

4137500 at *4.  As explained below, this substantial interest leads to the conclusion that

Wyoming is the appropriate venue for this dispute.

   a.   Wyoming's Substantial Regulatory Authority Over, And Economic Reliance On,
        The Project Supports Transfer.

      The localized nature of this controversy and its importance to the residents of the State of

Wyoming is particularly evident in the role the State plays in the project.  Wyoming not only was

a cooperating agency for the Wright Area EIS underlying the consent decision but also it has a

significant sovereign regulatory interest at stake.  The Wyoming Department of Environmental

Quality ("WDEQ"), the State Engineer's Office, and the Office of State and Land Investments

all have some oversight over the Project.  *See* Affidavit of Ryan M. Lance ("Lance Affidavit"),

attached as Ex. A.  WDEQ, not the BLM, will regulate all mining and reclamation for the

project.  Likewise, the Air Quality Division of WDEQ will be the sole regulator of air quality for

the project and it has a long-standing interest in air pollutant emissions associated with coal

development in the Power River Basin.  *Id.*  Finally, the Water Quality Division of WDEQ

possesses primary enforcement authority over water issues within the State.  *Id.*  Wyoming's

pervasive and sovereign regulatory authority in environmental issues associated with coal mining

within its borders underscores the localized nature of this dispute.  *See American Littoral Soc'y v.*

*U.S. Envtl. Prot. Agency*, 943 F. Supp. 548, 550-51 (E.D. Pa. 1996) (noting that interests of

justice "most strongly recommend[ed]" transfer of water quality litigation from Pennsylvania to

Delaware where disposition of case would "affect not only private citizens but also industries in

the state of Delaware;" transferring case would not harm interests of parties involved, and would

"bring the adjudication of this dispute to the venue directly affected by the interests at stake in

this case").

Further, Wyoming receives significant revenues from Powder River Basin coal
production, which funds public education, school capital construction, state highways, education,
and other important government functions.  *See* Lance Affidavit, ¶¶8-9.  In addition to the
benefits to the State, local governments and school districts rely heavily on real property and ad
valoreum taxes from the Powder River Basin coal.  *Id* at ¶9.  Beyond these direct economic
benefits to the State, coal production in Wyoming is a major economic driver of the local
economy: the mining sector accounts for approximately 28% of all employment in Campbell
County. *Id.*  Thus, Wyoming has a significant interest in the South Porcupine lease because it is
important source of jobs and revenues.[8]

      b.   <u>The Involvement Of Wyoming Citizens In The Public Process Also Establishes
that Transfer is Warranted.</u>

Plaintiffs suggest that Wyoming's local interest in this dispute is diluted by the fact that a
"significant number of comments" on the project came from Colorado.  Pls.' Br. at 11.
Plaintiffs' primary challenge here is to the Forest Service's consent decision.  Six comments
related to the Forest Service's consent decision came from Wyoming and only one from
Colorado (from Plaintiffs).  *See* ROD, Appendix (ECF No. 6).  To the extent that this Court
deems relevant the number of substantive comments on the BLM's Wright Area Final EIS and
Draft EIS, there were indisputably more substantive comments from residents of Wyoming than
from residents of Colorado: four comments from residents of Wyoming and two comments from
residents of Colorado for the FEIS; and nine comments from residents of Wyoming and three

---

[8] As discussed in Federal Defendants' opening brief, an Assistant Attorney General for the State
of Wyoming has indicated that the State will be filing a petition for intervention but have not yet
done so in light of Federal Defendants' pending transfer motion.  *Norbeck*, 2010 WL 4137500 at
*4 (finding that state's interest in intervention indicated localized nature of dispute).

comments from residents of Colorado on the DEIS.[9]  *Id.*  Further, a public scoping meeting was

held on July 24, 2007 in Gillette, Wyoming for the DEIS.  ROD at 30 (ECF No. 6).  Legal

announcements notifying the public of the intent to prepare the EIS were published in the local

newspapers, such as the *Gillette News-Record* and the *Douglas Budget*.  *Id.*  A notice of the

opportunity to comment on the Forest Service's consent decision was published in the *Laramie*

*Boomerang*.  *Id.* at 31.  Although the Forest Service did also publish a notice of intent in the

Federal Register, this notice does not render this project national in scope as Plaintiffs suggest.

Rather, under Council of Environmental Quality regulations governing "NEPA and Agency

Planning", an agency is supposed to publish a notice of intent in the Federal Register.  *See* 40

C.F.R. § 1501.7.

> c.  <u>Neither The Transport Of Powder River Basin Coal Across The Country Nor Air
>      Quality Impacts Mean That This Wyoming-Based Project Should Be Heard
>      Outside of Wyoming.</u>

Plaintiffs contend that Wyoming's compelling interest in this controversy should be

discounted because Powder River Basin coal is of regional and national significance given that

"transporting and burning coal" has effects across the nation from Oregon to New Jersey and "air

pollutants do not obey state boundaries."  Pls.' Br. at 17.  As a matter of logic, any effects from

air pollutants by reason of the Project will be more directly felt in Wyoming where the Project is

located.  This concern animates the long line of precedent holding that controversies concerning

environmental laws should be heard where the project is located.  *See National Wildlife Fed'n v.*

*Alexander*, 458 F. Supp. 29, 30-31 (D.D.C. 1978) (transfer from District of Columbia to the

District of South Carolina, where case challenged a permit authorizing construction of a port

terminal on a South Carolina river; court transferred in part because "the decision whether or not

---

[9] This tally does not include mass email comments — that is, form email comments that are largely indistinguishable — on the DEIS.  Almost twenty percent of these comments were from senders who did not identify their place of residence.

to proceed with the construction of the port terminal will impact primarily upon South Carolina."); *Norbeck*, 2010 WL 4137500 at *3; *SUWA*, 315 F. Supp. 2d at 88-89; *Flowers*, 276 F. Supp. 2d at 67.

Under Plaintiffs' theory of venue, if coal -- or any natural resource for that matter -- is shipped and sold in other states, or could have impacts in other states, then venue is appropriate in those states too and the case is, by extension, of national import.  Plaintiffs cite no precedent to support their expansive "interstate commerce" theory of venue.  Rather, Plaintiffs cite cases from the District of Columbia, where issues national in scope are often decided.[10]  Pls.' Br. at 17-25.  Under this line of precedent, the District of Columbia courts have found that, notwithstanding the location of the project elsewhere, venue was appropriate in the District of Columbia because, of *inter alia*, the material involvement of D.C.-based officials in the environmental review process.  For example, Plaintiffs erroneously cite *Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 13 (D.D.C. 2000), for the proposition that there is not a home forum for national controversies.  Pls.' Br. at 17.  There, the district court held that decisions regarding the development of oil and gas in Alaska had significant national implications as evidenced by the Secretary of the Department of Interior's substantial involvement in the decision-making process —"[h]e made a six-day visit to the area, and met with and was briefed by local Inupiaq Eskimo residents, government and industry officials, and scientists." *Id*. at 14.  So too with the other precedents upon which Plaintiffs rely.  *See, e.g., National Ass'n of Home Builders v. U.S. E.P.A.*, 675 F. Supp. 2d 173, 178 (D.D.C. 2009) (District of Columbia was the appropriate venue as "the high degree of involvement of officials outside of Arizona indicates that the validity of the determination carries significance beyond Arizona"); *Otay Mesa Property L.P. v. U.S. Dep't*

---

[10] In addition, Plaintiffs contend that because federal statutes and species of concern are at issue in the instant litigation, this case is of national significance.  As discussed above, this line of reasoning would render all NEPA cases national in scope.  This not the law.

*of Interior*, 584 F. Supp. 2d 122, 127 (D.D.C. 2008) (citing involvement of D.C.-based officials and noting that the outcome of this case "will have no direct or unique impact upon the residents" of the residents in the forum for which transfer was sought.).  In contrast, the decision here has predominately local implications.  Unlike the cases upon which Plaintiffs rely, no Forest Service official from Washington, D.C. had significant involvement in the project consent decision.  Moreover, as discussed above, the Environmental Protection Agency ("EPA") has delegated air quality regulation to the State of Wyoming, which further highlights the localized nature of this dispute.

Thus, the localized interest in the Project favors transfer to Wyoming.

### 3.  The Other *Chrysler* Factors are Neutral or Support Transfer.

The other *Chrysler* factors relevant to a venue motion are either neutral or support the proposed transfer.[11]  First, there is no dispute that live testimony in this litigation is highly unlikely or necessary because the claims in this case will be reviewed as an appeal under the Administrative Procedure Act ("APA") on the basis of an administrative record.[12]  *Norbeck*, 2010 WL 4137500 at *3; *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1580 (10th Cir. 1994).  To that end, despite Plaintiffs' suggestion to the contrary, live testimony from Mr. Nichols to establish standing will be unnecessary as written declarations generally suffice in an

---

[11] As discussed in Federal Defendants' Opening Brief, the Tenth Circuit has noted that the most relevant statistics to evaluate a court's congestion include the pending cases per judge and the average weighted filings per judge.  *Emp'rs Mut. Cas.,* 618 F.3d at 1169.  On this score, the District of Wyoming has a substantially less congested docket than the District of Colorado.  The most recent statistics provide that the overall filings in the District of Wyoming are 735, compared to 4,041 in the District of Colorado.  *See* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/DistrictCourtsSep2011.aspx (last visited Mar. 30, 2012).   If this Court considers this factor, Wyoming courts are less congested than Colorado courts.

[12] While Plaintiffs admit that live testimony is unlikely, they repeatedly reference Mr. Nichols' residence and the relative convenience of Colorado for Mr. Nichols.  Pls.' Br. at 2, 5-6, 9, 10, 11, 13, 15, 16, 18.  But as Federal Defendants discuss above, Mr. Nichols' live testimony will likely not been needed because a written declaration will suffice.  *See* supra.

APA case.  *See New Mexico ex rel. Richardson v. Bureau of Land Management,* 565 F.3d, 683, 696 n. 13 (10th Cir. 2009) (evaluating organizations' member declarations—that were "attached to their opening brief"—in order to evaluate organizations' standing).  As such, the convenience of witnesses carries little weight.  *Trout Unlimited*, 944 F. Supp. at 18; *see also SUWA*, 315 F. Supp. 2d at 88 (not considering convenience to witnesses where court's review would be based upon administrative record and parties agreed witnesses would not be necessary). To the extent that this Court deems convenience of the witnesses relevant, the significant majority of witnesses live in Wyoming.  *See* Ex. E[13]  Colorado is clearly an inconvenient forum for Federal Defendants.  In contrast, Plaintiffs name one witness who resides in Colorado.  Balancing Plaintiffs' one witness against Federal Defendants' four witnesses in Wyoming underscores that Wyoming is the appropriate forum to adjudicate this dispute.

Second, Plaintiffs dedicate a significant portion of their brief to the fact that their counsel is located in Colorado.  But, as this Court held in *Norbeck,* location of counsel is irrelevant:

> Plaintiffs counter, arguing that transfer would result in significant inconvenience to them. Specifically, Plaintiffs argue that their counsel are not admitted to practice in the District of South Dakota and they have been unable to locate sufficiently qualified local counsel. Even if Plaintiffs' counsel are not admitted to practice in the District of South Dakota, "the location and convenience of counsel is not a relevant factor" in considering a motion to transfer venue. *Bailey*, 364 F.Supp.2d at 1230. This concern is further allayed by the fact that Plaintiffs' counsel may seek admission on a pro hoc vice basis under the Local Rules of Civil Practice by associating with a member in good standing of the bar of the District of South Dakota. D.C.S.D. L. Civ. R. 83.3(E) (Doc. 17-10). Although Plaintiffs' counsel asserts they do not know any attorneys in South Dakota, there is no reason to believe that Plaintiffs' counsel could not conduct a reasonable search to locate a local counsel to sponsor their pro hoc vice application. This argument is irrelevant to my determination, and I give it no weight.

---

[13] Plaintiffs' statement that Colorado is a more convenient forum for Federal Defendants is flatly contradicted by Federal Defendants' Exhibit E.   Plaintiffs, in contrast, name only one potential witness in Colorado.

*Norbeck*, 2010 WL 4137500 at * 4; *see National Wildlife Fed. v. Harvey*, 437 F. Supp. 2d 42, 48 (D.D.C. 2006) (same).

Here, Plaintiffs, as students, may seek *pro hac vice* status under the Local Rules of Civil Procedure in the District of Wyoming simply by finding an active member of the Wyoming State Bar willing to provide general supervision.[14]  Plaintiffs do not allege that they have made any effort to locate Wyoming counsel.  As in the *Norbeck* case, there is no reason to believe that Plaintiffs could not find an active member of the Wyoming Bar to sponsor them.[15]  *Norbeck*, 2010 WL 4137500 at * 4.  Thus, Plaintiffs' statement that they would be "unable to participate in oral arguments or other court hearings" if this case is heard in Wyoming is without support.  Pls' Br. at 13.  Indeed, as the Law Clinic's own materials make plain, law students participate in

---

[14]  Plaintiffs cite Rule 12(b)(2) of the Supreme Court of Wyoming, which provides the terms on which students may be admitted under pro hac vice for "indigent persons."  *See* Rules of the Supreme Court of Wyoming Providing for Organization and Government of Bar Association and Attorneys at Law of the State of Wyoming, Wyo. R. 12(b)(1) (available at http://courts.state.wy.us/CourtRules_Entities.aspx?RulesPage=OrganizationAndGovernmentOfWyoBarAssociation.xml).  Plaintiffs do not allege that they are "indigent."  Indeed, the Sierra Club had over $84 million in total revenue in 2009 and WildEarth Guardian reported over one million dollars in revenue.  *See* Ex. B and G.  The applicable rule is Rule 12(b)(1), which provides in pertinent part:

(1) An eligible law student may engage, as an intern, in the practice of law under the general supervision of an active member of the Wyoming State Bar, other than a professor of the law school, conditioned as follows:

   (i) The person to be represented consents in writing to legal assistance to be provided by the student;

   (ii) The supervising lawyer shall be present whenever the law student appears before any court, tribunal, commission, board or other governmental agency of the state unless such presence shall be waived in each instance by such court, tribunal, commission, board or other governmental agency. . .

[15] Although BLM allowed companies to bid for the South Porcupine lease tract, there were not any successful bidders.  *See* Ex. H.  Thus, there are not any immediate on-the-ground activities planned.  Nor is there any statute of limitations issue.  Plaintiffs should thus face no time pressure to locate a Wyoming counsel to sponsor their *pro hac vice* application.

litigation in Federal District Courts well beyond Colorado's borders, including New Mexico, Nevada and California, among others. *See* Ex. I.[16]

Similarly, WildEarth Guardians' statement that they cannot secure other counsel than the Law Clinic also falls flat given they have several in-house counsel (*see* Ex. F and http://www.wildearthguardians.org/site/PageServer?pagename=about_staff). *Id.* To that end, WildEarth Guardians have filed two similar suits against BLM in the United States District Court for the District of Columbia challenging other leases approved in the Wright Area EIS.[17] In those cases, which have overlapping issues with this litigation, Plaintiffs relied on in-house counsel and also retained outside counsel.

Finally, turning to the remaining *Chrysler* factors, "[t]here is no question as to the enforceability of any potential judgment; there are no perceivable advantages or obstacles to a fair trial; and there are no questions of local law which either court would be better suited to address." *Norbeck*, 2010 WL 4137500 at *5. These factors are neutral.

Thus, the Court should conclude that the interest of justice supports transfer to the District of Wyoming.

---

[16] Plaintiffs complain about a $100 filing fee for pro hac admission and increased travel costs if this case were held in Wyoming. With respect to the former, as noted *supra*, Sierra Club reported revenue of over $84 million. Moreover, if Plaintiffs' case is successful, and they establish eligibility, they may be able to recover such fees as part of the Equal Access to Justice Act ("EAJA"). For example, WildEarth Guardians received considerable EAJA fees last year. *See* Ex. B, F. In addition, while Cheyenne, Wyoming is farther from Boulder, Colorado than Denver, Colorado, both courthouses are within easy driving distance to where Plaintiffs' counsel and their sole witness reside.

[17] *WildEarth Guardians v. Salazar*, 1:11-cv-0670-CKK (D.D.C.); W*ildEarth Guardians v. United States Bureau of Land Management*, 1:11-cv-1481 (D.D.C.).

## <u>CONCLUSION</u>

The public and private interest factors, including Wyoming's compelling interest in this controversy, support transfer of this case to the District of Wyoming.  For the foregoing reasons, the Court should grant Federal Defendants' motion and transfer this case to the United States District Court for the District of Wyoming.

Respectfully submitted on this 30th day of March, 2012,

<div style="margin-left: 40%;">

IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division


   /s/ *Marissa Piropato*
MARISSA PIROPATO
Trial Attorney (MA Bar #651630)
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
marissa.piropato@usdoj.gov
(202) 305-0470

Attorney for Federal Defendants

</div>

### CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, I electronically filed the foregoing notice with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to Plaintiffs' counsel.

/s/ *Marissa Piropato*
MARISSA PIROPATO